Good morning. May it please the Court, my name is Michael Miller, and I proudly represent Mr. Dalmolin and his daughter, Chris Malin. I do want to reserve some time for rebuttal, please, perhaps five minutes. Okay. If you try to keep track of your own time, we'll try to help, too, but if you can keep an eye on the clock. Thank you. It counts downward. Gotcha. And I'd appreciate it if you'd keep your voice up when speaking. I'll do so. Yes, sir. We allege that government agents used here technique developed by mobsters to punish those. Say that again. We allege that in this case government agents employed a technique developed by mobsters. I thought you said mobsters. Okay. To punish. Mr. Miller, this is not a jury. This is an appellate court. I understand, Your Honor. What you allege is in your complaint. We are reviewing a dismissal of an order, dismissal of a complaint under Section 12B-6. We're not interested in any allegations you might make as an attorney in a final jury argument. We are interested in your points as to what statements were made in the complaint of Ms. Is it Malin? Malin. Yes, sir. Of Ms. Malin which state a cause of action. And the first thing I'd like you to do is to tell me what cognizable interest under Lujan did she allege was invaded by the prosecution of her father. Can you tell me? Can you direct yourself to that? Your Honor, we know that our complaint was broadly drafted because we felt this was a case of first impression. I believe it is. Neither counsel or the court before was able to find an opinion that dealt with retaliation directed at, here, a father to get at their daughter to chill her First Amendment rights. We made those allegations in the complaint. We rely on the Manicino Environmental Center case and the pool cases that we've cited in our briefs that the district court here ruled, as it did, regarding Ms. Malin on the basis that she did not show an actual injury to her First Amendment rights. Right. Was there at any point any allegation that Ms. Malin was fined by the county of Napa, lost money, or was imprisoned, or was arrested, or had tape put over her mouth? No, sir. No. What is her injury, then? Did she allege that but for the prosecution of her father by the county of Napa, she would have given a speech in Napa on environmental issues but was not – but was intimidated and therefore did not give a speech and lost an audience? Are there any facts which in any way allege an actual cognizable interest which has been denied her? Our complaint was pretty thorough in alleging the facts of Ms. Malin's activism as an environmentalist in Napa County. Now, let me ask you one more question. Did Ms. Malin ever allege that she received intentional infliction of emotional distress at the sight of seeing her father prosecuted on this unsuccessful prosecution? Did she allege that? It's in the record in her declaration, and I do believe it is alleged in the counsel. This is a 12b-6 motion. What the declaration was on the motion for summary judgment is not an issue. What is an issue is what she said in her complaint. I'll repeat the question. Did she allege intentional infliction of emotional distress by the county of Napa as to her by outrageous conduct which caused her distress at the sight of her father being prosecuted? I believe distress was alleged, but most importantly what was alleged – Could you give me the citation to your complaint where alleged distress – intentional infliction of emotional distress was alleged? Would you like me to pull it, sir? I don't have it. Why don't you do it during your rebuttal? Very well. I threw a question at you. Go ahead with your presentation. Thank you. I want to get back to your question, though, because we do clearly allege without question in the complaint that this was conduct intended to chill her First Amendment political activism and that it did in fact have an impact on her. She is not just a casual environmentalist, and the complaint sets forth the 20-year history she has in Napa County, suing on behalf of the Sierra Club and being successful to where she truly is an enemy of county planning and the wine industry in Napa County. And at the time of these matters, in 2002-2003, she was very active in Napa County's stream setback ordinance campaign, and so it was contemporaneous with her activities there. What act or event did she not participate in because of this chilling effect? Well, we don't allege that it did actually chill her, but we argue, however, under Mendocino Environmental Center and Pool, that that's not the standard of this court as set forth by this court, that all that need be shown is that a person of ordinary firmness would be chilled, not that Ms. Malin, we do not have to show that she was in fact chilled. And that is the law that the district court did not follow here. Again, both Mendocino Environmental Center and the Pool case cited in the briefs, as long as it's shown that there was an intent, and I think the evidence is manifest there was an intent here to chill her, to attack her, have her be a target of her First Amendment rights, to back her off, to retaliate against her, as long as it would chill a person of ordinary firmness, she's able to state a cause of action. Let me say this. I can't claim that I found it. But I can claim that I've got a resourceful law clerk who found a case that may be on point that neither of you has cited and that the district judge didn't cite. It's called Biggs v. Best Best and Krieger. Here's the citation, 189 F. 3rd, 989, Ninth Circuit, 1999. I think it's on point, and I think it's against the position you're here taking. And if I had been on the ball, I would have alerted you prior to oral argument on this case. What I'd like to do is make sure that you have a chance, both sides, if within the next week you want to submit I think a two-page letter brief is all you need, if you care to respond to this case. But I don't want to have a sort of a sneak attack that all of a sudden you see a case mentioned in the disposition that you never heard of and the district judge never heard of and so on. Did you get the citation? I did, Your Honor. But I'm afraid that may sink the retaliation case brought by Ms. Mallon. I had served the Court a letter here in the last few days of some cases. They're not on point. They're third-party reprisal cases. I don't know if it's that. I think my fellow panelists got that. I do have that letter. They're not on point because they're third-party reprisal cases, but they're cases where the plaintiffs were suing because of allegedly unconstitutional conduct directed at them for the conduct of a relationship. And I would just argue that those cases I think stand with the proposition that if those plaintiffs were able to seek redress for constitutional violations directed at third parties related to them, how can it be that Ms. Mallon here is unable to seek redress when this was clearly intended to chill her? She was the target of this, and it just was indirectly through her father. Well, she might or might not have been. I mean, obviously, you've got some evidence for that, that notation at the bottom with exclamation marks, this is her father, so-and-so. If I may, there's so much more evidence than that. That memo alone, besides that incredible entry on the bottom of that memo of, FYI, for your information, Bill Dahlmohlen is Chris Mallon's father, all in capital letters with exclamation points and underlined. Above it is a whole paragraph, all in capital letters, requesting criminal prosecution with a thank you in capitals. We also have the amazing testimony that Ed Colby did this memo without getting approval of his boss, Patrick Lynch, the assistant planning director. That was his testimony. Patrick Lynch testified under oath that he didn't know about it until afterwards. Patrick Lynch testified later that it was clear people went behind his back. The whole scheme in Napa County is voluntary compliance. That is their policy and their practice. That's what they encourage. And that's what Mr. Dahlmohlen was in the middle of. Let me ask you, I'm now moving off of the First Amendment chilling argument directly to the malicious prosecution argument. Now, the district court disagreed with you on that also. Could you make your best argument as to why you think this is malicious prosecution? Well, unfortunately, the district court didn't analyze it as a malicious prosecution  We did refer to malicious prosecution in our complaint. It's been there from day one. But it wasn't analyzed as a malicious prosecution case. Well, okay. Persuade me why you think it's why we should think that it's malicious prosecution. Well, and what I was just mentioning as far as this voluntary compliance scheme, without question, Mr. Dahlmohlen was in that scheme with Patrick Lynch, was doing what he was supposed to do, and without his knowledge, Ed Colby seeks to get him prosecuted. Are you claiming – pardon me, let me ask you this straight out. Where do you prove that there was a lack of probable cause for prosecution? I mean, there's no question that he started cutting the road without a written permit, correct? Isn't that a prima facie case of violation of the Napa Ordinance? Well, the Awad facie case. Well, they couldn't prove it beyond a reasonable doubt. They couldn't prove the necessary mental elements, whatever, right? But where is the lack of probable cause when it is undisputed that Mr. Dahlmohlen started cutting his road without a written permit? Well, Awad is what we rely upon, that the prima facie showing a probable cause can be defeated by showing that it was developed in bad faith. And here it was. Mr. Dahlmohlen was doing nothing other than what was agreed with between him and the assistant planning director, Patrick Lynch. He was specifically told, and it is clear in the record, that as long as you follow the direction of Drew Aspergren and the county consultant, Doug Nix, and get your erosion control plan application in, there's no violation. There's no criminal violation. Now, that's his testimony. Was there testimony that went the other way, or I don't remember the conversation? I mean, this happens sometimes, that what I think I heard somebody else doesn't remember having said, you know. Well, there's a letter from Mr. Pollack to Patrick Lynch that's in the record confirming the discussion, and the testimony in the record of Drew Aspergren and Doug Nix supports what I've just said. And what's really interesting here is Mr. Dahlmohlen got his erosion control plan application in in September, and they denied it, not because of the work he was doing on the road at that time, which they knew about. They denied it because of a manufactured reason that he didn't have building plans, building permits, something that Mr. Pollack, and it's in the record, said that that never happened. People are allowed to put in building permits and plans later all the time. So the erosion control plan application was in before the button update of the hillside. October 15 was the deadline by which the hill was supposed to be buttoned up, as Mr. Nix and Mr. Aspergren directed. Mr. Dahlmohlen did exactly as they said. Very probative is Mr. Lynch's testimony is that, I think he says, quote, unquote, Mr. Dahlmohlen tried like the Dickens to comply. Another thing very probative, Mr. Zimmerman testified that nobody has ever been prosecuted for work they did that was ultimately completely approved. So this probable cause was manufactured, and that defeats the prima facie showing a probable cause. Now, I tried this. Defeating the case doesn't mean that there wasn't probable cause to go forward in the first place. Or am I missing something? I believe you are, Your Honor. There was no probable cause to go forward. Again, the evidence is to be viewed most favorably for plaintiffs here on the summary judgment motion. And Mr. Dahlmohlen's testimony was that he was told at the outset, before he did any work at all, that he could do his pioneer road and that no grading permit was required. The first day he started that work, Ed Colby came out and red-tagged him. He stopped the work. He did nothing further until he reached the agreement through his attorney, Mark Pollack, with the assistant planning director, Patrick Lynch. And thereafter, all he did was what was agreed upon with Patrick Lynch. And then without Patrick Lynch's knowledge, Mr. Colby goes behind his back, as Mr. Lynch confirmed, and refers Mr. Dahlmohlen for criminal prosecution, clearly because he wanted to poke back and retaliate to his daughter. Now, did the prosecutor not check back with Lynch before instituting the prosecution? That appears to be the case, that there really was not ñ there was a horrible failure by the district attorney. When he saw that memo and saw how inappropriate that was, the first thing he should have done is to call and say, what's going on here? This doesn't seem kosher. And, you know, learn the facts. Talk to Drew Osberg. I want to make sure I understand how much we know and we don't know. Do we know, yes or no, whether or not the prosecutor checked back with Mr. Lynch? I believe there's an e-mail on the record between Mr. Zimmerman and Mr. Lynch, but it's incomplete, and I don't ñ there's nothing else in the evidence that I'm aware of or recalling besides that memo. And that memo is not particularly probative, and it doesn't show Mr. ñ Now, are you talking about memo or e-mail? E-mail, I'm sorry. E-mail. E-mail, yes. And was that e-mail exchange before the filing of the information? Yes, sir. Okay. Yes, sir. So there was some contact, the nature, and there may have been conversations that we don't know about, but we know there was some e-mail contact. Correct. Okay. Yes. And I just can't emphasize enough, Mr. Zimmerman, the deputy DA, testified that the only remedy he felt he had was criminal, not civil, because all he has is injunction powers and no real teeth. However, if Mr. Colby felt that the paving set forth in the erosion control plan application in September that was ongoing at that time and which he saw and had reports of, if he really wanted to stop that, he could have gotten that injunction and stopped that work on the road. But he didn't do so. He lied in wait, and he let Mr. Dalmo and follow what the agreement with Mr. Lynch was, to follow Mr. Asperger and Mr. Nix's recommendations. And he did just what he was told to do, what was best for that hillside, only to later be prosecuted. And the statistical analysis here, I think, feeds also not just the selective prosecution allegation but the malicious prosecution. They just do not prosecute people for these things. They have this voluntary compliance scheme. But that's a matter of discretion by the district attorney who has to run for office. The issue here is not that. The issue here is whether, as a matter of law, there was probable cause when there was a prima facie violation of a local ordinance which requires a permit before you dig a road, period. Now, tell me why that isn't probable cause. Well, you might want to vote against the DA next time he comes up, right? Maybe that's not your only solution. I think I've addressed it. The probable cause was manufactured in bad faith, that they set him up. The probable cause was you've got to have a permit before you dig, right? Yes. Now, were there any allegations that he applied for a permit and was not allowed to get a permit and he was suckered into it, told that he didn't have to have a permit? Is that your position? Yes, it is. Where is the evidence that he applied for a written permit before he dug the road? Mr. Dalmohan's testimony, and it's alleged in my complaint that Mr. Dalmohan, before he did anything, went to the desk at the planning department and spoke with Naomi Beatty. And he understood from her that no permit was needed. She put him in touch with Larry Bogner, who told him from Public Works that a grading permit wasn't needed. Now, I will say Naomi Beatty disputes that. She says otherwise. But Mr. Dalmohan, his testimony is that she was told that he didn't need any permits. Larry Bogner told him he didn't need a grading permit. Let me help you out here. We're down to a minute and a half, and I think you'd probably like to save some time. So let's hear from the other side, and then we'll make sure you have a chance to respond. Thank you. Good morning, gentlemen. My name is Gary Lepre. I represent the County of Napa. It is also my understanding that this was a motion for summary judgment as opposed to a 12B6 motion, if I understand the distinction. Secondly, with regard to Ms. Malan, I am not aware of any evidence of any discreet injury or harm to her. In fact, I think the plaintiff's position is captured in his, at least in his reply brief, when he refers to the fact that if one is a relative, close relative, in this instance daughter, that one is, quote, necessarily, close quote, his word, not mine, injured as a consequence of the distress to the father. Whether there's evidence is not really an issue on the appeal of Ms. Malan. The question is, was there an allegation in her complaint that she was injured as a result of this? And her only injury is her chilled First Amendment rights, right? Yes, except I think we went beyond allegation to material facts inasmuch as it was a motion for summary judgment, and so we don't know. I was under the impression that her complaint was dismissed on 12B6 standing grounds. I. Was her complaint dismissed on Rule 56? I thought it was. I thought they were mixed, to tell you the truth. All right. And yes, yes, it was dismissed on standing ground in part. I thought, and it's very easily retrieved, the order, I thought, had multiple reasons for the dismissal as to her. But let it be standing, and let it be 12B6, because the analysis and the analytic route is certainly the same. And that is that there was no evidence, no demonstration of any kind other than that she, quote, quote, would have been injured because of her perception of distress to her father. And can I ask you a question? Yes, sir. Judge Fletcher mentioned the Biggs case, and you win with that. The circuit has already held that you can't go from an injury to a close relative to an injury to yourself on constitutional grounds. So that's open and shut unless we ask the Court to take it on bank, which we could do. And I must say, reading it as an original proposition, I thought Biggs was wrong, because it does seem to me the relation of father and daughter, husband and wife, father and son, is close enough so that if a malicious county official wants to strike back, it's very easy to strike back in retaliation at the relative and not at the active environmentalist. Now, why shouldn't there be a chilling as the retaliatory? She's a terrible nuisance. It's perfectly clear, I think, that she's a terrible nuisance to the county planning people. And so they say, well, let's hurt her. And they go ahead and hurt her father. Now, why shouldn't that be actionable? Do you want me to make the assumption that, A, she is a nuisance and that they don't like her? I'm assuming those facts, yes.  I don't assume that. Okay. But making that assumption, there still has to be a demonstration of injury. I mean, we are all — Well, excuse me. Isn't the injury that she is hurt by her father being subject to criminal prosecution? But any — the grandchild, parent, parents, any loving person — No, no. Don't exaggerate. I'm not exaggerating. You can't stop it. Father, daughter, father, son, son, father. Well, you're going to — I primarily practice in state courts, so we're going to get sort of a bystander liability argument. First, you know one of the major problems is where do you stop it. What are going to be the criteria for the injury? And at the very — whatever those criteria are, at least there has to be some manifestation of the injury under your suggestion. There has to be some evidence that demonstrates that there was a harm rather than merely a subjective reaction of distress. If you do that, I mean, welcome to federal court law, because it will never not be for any loving relationship. Yeah, I was distressed that Dad had embezzled money from his company, and he was being — and he was being prosecuted, and, you know, I think they set it up, et cetera, et cetera. You can't end it unless, perhaps, you're able to point to some discrete injury. There's nothing here. Nothing. Well, let me pursue Judge Noonan's line of questioning. The district court — and I'm now assuming that the Biggs question is up for grabs, as indeed both of you have been incorrectly assuming. But now for the moment, I'm assuming that Biggs has not been decided. The district court held as a matter of Article III that there was no standing. And in order for there to be no Article III standing, there has to be no injury in fact. I think it is commonsensical and would be instantly agreed to by any of us that for most parent-children relationships, if I injure the father, the children will be to some degree distressed. I agree. Whether that gives you a cause of action in law is a different question. Yes. But that there would be some injury to the children, I think, is indisputable. And that, then, I think, does cast doubt on the district court's Article III analysis. Now, whether or not there's a cause of action under 1983 for a chilling effect to First Amendment rights or retaliation in response to or protection against her assertion of First Amendment rights, that's a statutory question filtered through with a constitutional question under the First Amendment. A retaliation law under things like Title VII is very protective against retaliation. That is to say, I don't know whether you do Title VII cases. I've done some. But Title VII cases, let's say that I've made a complaint in the workplace about what I think is discriminatory behavior toward one of my colleagues. Yes. And at the next sort of office party, I am deliberately excluded from the invitation list. That's retaliation under Title VII. Provided you can prove that you were, in fact, deliberately excluded. That's correct. But I'm now not arguing fact as to whether this was the motivation. I'm assuming, which you don't need to concede, that this notation at the bottom and so on, that this really was done for that purpose. So I'm only arguing standing on that assumption, not on the proof. I mean, that could go forward. But if we're talking retaliation law coming out of Title VII, and if the allegations and his version of the facts are right, this sounds like retaliation to me. Now, you can say, but it's not true. I understand that. But assuming it's true, why is there no cause of action? Well, if you make all of those assumptions, you put me in a position where I have to step away from factual reality and step forward. I'm not asking you to concede any facts. I'm asking for purposes of the argument that we assume that there has been a showing or could be a showing if it went to trial and a jury could decide that the motivation for bringing the criminal prosecution against the father was in part to retaliate against the daughter. You don't need to concede that reality, but for purposes of the question. For sure. In that case, you're asking if there is a demonstration of such retaliation, does that allow the maintenance of cause of action? I mean, I think the answer is sort of inescapably yes, especially in view of this circuit's view of retaliation, at least to the extent that I'm familiar with it, generally. But again, it assumes a demonstration. But assuming that demonstration, then yes, I have really no choice but to agree with you. I think there's ample precedent that allows you to make that theoretical proposition. Yeah. That's my problem with this case and it's my problem with Biggs. Biggs goes the other way. I mean, it was basically a parent-child relationship and a retaliation. It's actually remarkably similar to this case. It didn't involve road raiding, but it might as well have. But you have to, again, though if that is your problem, it seems to me that where you have to then eventually migrate is to the presence of the evidence. What are the material facts that are applicable to this otherwise inviting theoretical situation? Right. You've got to get there. Right. And when you get there, you find a void. Well, I'm not sure you do. I am. Depending on, I don't know whether we want to call this summary judgment as to the daughter and retaliation or whether we want to call it 12b-6. Okay. The district judge chose the vocabulary for the rest of the case to be summary judgment and for this part of the case called it dismissed. But he didn't say whether he was dismissing it as summary judgment or dismissing it as 12b-6. So I think I'm not – frankly, I'm not sure which one the district judge decided to do it. I read it. You know how I read it. Yeah. I think you could read it either way. But either way, if it's a dismissal on the pleadings, we're dealing with Rule 8a, which is very generous. That is to say, plain statement, short, plain statement and so on. I think that sort of injury probably is fairly within the complaint if we read it as under the Federal pleading rules on 8a, which means, okay, it's up for grabs. We don't know. If we treat it as summary judgment, there's evidence that goes both ways. There's evidence that goes in their favor and there's evidence that goes in your favor. That is to say, they've got a fair amount of evidence. I think that capital letters notation at the bottom gets them past summary judgment if there indeed is a cause of action. Now, you know, then it goes to the jury or if it goes to the court, to the fact finder, the court is the fact finder. It's not possible. It's just a statement in capital letters what the meaning of the claim is. And from which one could readily infer that the motivation for seeking the criminal prosecution is to get at her. In which case, you would go, I assume, if not to the author, you would go to the person who made the decision and determine whether or not that person was influenced at all by that statement. He testified plainly that he was not. He testified plainly. People say things all the time that juries are at perfect liberty to disregard. Except in this instance, it was testimony before a jury. There was a criminal trial. It was jury testimony, granted not in this civil case. But the DA, Zimmerman, has testified elaborately as to his reasoning process, whom he consulted, why he consulted. But he lost the case. Sir? He lost the case. I'm a former DA. I don't understand that you say a jury heard it. They heard it and he lost the case. So what relevance does that have? The relevance is that he was not motivated to proceed with the prosecution. Well, we don't know what the jury thought of his argument, so please don't argue. Another jury passed on the credibility of his statement. It's just not relevant at all. I was not so arguing, though. It's not relevant. I agree. That wasn't my point. My point was that one has to go to what the DA's reaction to the sentence was in order to determine to what extent, if at all, it was in play. I'm not at all sure that's true. And I'm not sure that you or I can determine that. I think a jury would have to determine it. And the only jury that's heard anything in this case didn't believe the prosecution. But go ahead. Well, we don't know if it we found the jury found that the case had not been demonstrated beyond a reasonable doubt. I don't know why the jury decided. Yeah. And, of course, neither do we. Exactly. And I'm not sure I want to pursue this much farther, but I think I heard you say that the DA testified to his motivation in bringing the prosecution. Did the DA testify in the criminal trial? To the extent that the declaration is oh, no, I'm sorry, sir. He has a declaration. We have a declaration from him. In this case? Yes. And we also have his – we also have his deposition testimony. But there really might remain a question of triable fact as to retaliation that the district court here didn't get to because the district court just dismissed it saying there's no standing. In theory, you would be correct. Yeah. Yes. May I shift gears briefly? Bear in mind that part of the difficulty in this case was the omnibus cause of action. And referring, Judge B, to your inquiries about malicious prosecution and probable cause, malicious prosecution has become part of this case. I mean, it's become part of this discussion. It's in the briefing. But in my view, like Judge Alsop's, it was not implicated as part of the complaint, assuming, however, that it was. We know that there was, I believe as a matter of law, that there was probable cause, and we know for not only because of the factual background, but also at the time of the criminal case, the defendant did have the opportunity to challenge probable cause. There was no such challenge. There was a challenge, as it happens, to dismiss on the grounds of selective prosecution, which was denied. But there was no challenge as to the lack of probable cause. And it proceeded, and the jury did whatever the jury did. It acquitted. But it would seem to me self-evident from the record as a matter of material fact, there's no contradiction of the presence. You mean he had a chance to challenge probable cause by a pretrial motion? Is that what you have in mind? Yes. A 995 motion, something like that? Well, this was a misdemeanor. So I don't think that would apply. At his arraignment, he could have challenged probable cause. Yes. But you can do it before trial itself. You just move to dismiss. And it's a complaint as opposed to an information. I mean, but those particulars notwithstanding, there was room to challenge this. There was, in fact, probable cause. I mean, that's what I see in my time. I think the question is, is it the discretion of the district attorney to have decided and so he did? And I guess by way of summary, as far as — oh, I should mention one other thing, if only for me. If you have four minutes, you're doing fine. The depiction of what people said and who testified as to what is troublesome for Napa County, to the extent that it concerns you, there has been reference to the fact that Mr. Lynch testified that people went behind his back and that there is a citation given for that. If you are inclined, please read it. That is not what he testifies to. He also does not testify to the fact that he disproved even later what Mr. Colby wrote. In fact, his testimony was that it was just a matter of style. He wouldn't have written it, but Colby did. So to the extent that these assertions are made, that there were these definitive remarks, you're not going to find them in the record. The last example would be the reference that is made to, in response to one of your questions, whether or not Mr. Dalmohan was given assurances that there would be no prosecution.  It's an issue of fact that Zimmerman could agree or not agree with and still have probable cause. I agree with that. It's just that the example that was given to you was that the attorney had written a letter, but if you read the letter, you'll see that it says it was his understanding. And, by the way, if only because it's a matter of courtesies, one should also be reminded that before the criminal case was filed, and, by the way, I don't think a DA has any obligation whatsoever to either contact or seek the approval of the referring department before the DA decides to file a criminal complaint. He doesn't need plannings, approval, consent, concurrence, anything. But in this instance, Zimmerman actually met with Mr. Dalmohan's lawyer before the case was filed. He met with him, and that lawyer's testimony as to that discussion and to the lawyer's understanding about what was to be forthcoming and why is in the record. So this was not – there was no backstabbing, sneaky, middle-of-the-night aspect to this at all. So those remarks, at least, as I say, if only for me, I want to have clarified. Otherwise, I think that if this single cause of action is to be construed as malicious prosecution, and you'll note that we have not so much as alluded until this second, I don't think, to selective prosecution, which was the source of concern in the motion, it was certainly the basis of Judge Alsop's ruling. If we have moved or shifted to malicious prosecution, then, in my view as a matter of law, there was probable cause here, and as there was probable cause here, then while there can be distress over an arrest, to come back to your point, Judge Fletcher, no, I do not think that you can sue for distress over the arrest of a relative when the arrest was proper. Thank you, gentlemen. Unless you have something further of me. Roberts. Further questions from the bench? No. Thank you very much. Thank you, sir. Response. Thank you. Let me first say the assertions I made are all supported in the record. I cite directly to the testimony that supports everything we've asserted relative to statements by Mr. Lynch and the like. And, Judge Baird, to answer your question, page six, line five of our complaint, in the record it's page number 0006 of the excerpt on record, does allege emotional distress on behalf of Chris Malin. And absolutely injury can be assumed here to Ms. Malin. Her father was attacked because of her political activism. How could that not cause? That's manifest to set someone back on their heels, to upset them, to be scared, to think that government would do this? Not in this country. That's not proper. They're entitled to their day in court. This should have been a horse race and they're entitled to have the horse race. And I tried that criminal jury, that trial. I was the trial attorney. I know why that jury returned that verdict. This is wrong. If there's any other questions. Could I say to you as well as the counsel on the other side, we've let the cat out of the bag as to Biggs. Biggs, you lose if Biggs is the law. You win. So when you're addressing it, you really have to persuade this panel to seek an en banc if you're going to win. Thank you, Your Honor. Just to make sure that both of you have the citation, 189 F. 3rd. 989. Ninth Circuit, 1999. Biggs versus Best, Best and Krieger. And if you could please submit simultaneous letter brief to this court within the week, on your view, I will not limit you as to pages you write as much as you think appropriate. When you use the term within the week, do you mean by Friday or a week from today? A week from today is fine. Okay. Thank you very much. Thank both of you. We thank counsel for their argument. The case adopted.
judges: Noonan, W. Fletcher, Bea